5-22-15 Rt

RECEIVED
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MAY 2 2 2015

FILED_____
DOCKETED_____
                    DATE      INITIAL

JOHN THAT LUONG
Reg. # 08838-097
U.S.P. - Canaan
P.O. Box 300
Waymart, PA 18472

### UNITED STATES COURT OF APPEALS

### FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case No. CR96-00094-1 JSW |
| Respondent, | ) |
| | ) |
| v. | ) THE HONORABLE JUDGE |
| | ) JEFFREY S. WHITE |
| JOHN THAT LUONG | ) |
| Petitioner. | ) |

15-15777

### APPLICATION FOR CERTIFICATE
### OF APPEALABILITY

To the Honorable, the Judges of the Said Court:

Petitioner JOHN THAT LUONG moves the Court for a Certificate of Appealability, and in support states:

(A) Standards for granted a Certificate of Appealability:

"A petitioner is entitled to a Certificate of Appealability if he makes a substantial showing of the denial of a Constitutional right." 28 U.S.C. §2253(c)(2). The U.S. Supreme Court in Barefoot v. Estelle, 463 U.S. 880, 893 (1983), held this means that the appellant need not show that he would prevail on the merits, but must "demonstrate" that the issues are debatable among jurists of reason: that a court could resolve the issues, in a different manner, or that the questions are adequate to deserve encouragement to proceed further. See Flieger v. Delo, 16 F.3d 878, 883 (8th Cir.1994); Also see Cooke v. Solis, 606 F.3d 1206, 1212 (9th Cir. 2010)(Certificate of Appealability warranted when petitioner demonstrated constitutional violation and

followed then-established path of Habeas Appeal).

This standard does not require the petitioner to show that he is

entitled to relief:

> Also the Court does not require Petitioner to prove, that
> some jurists would grant the Petition for Habeas Corpus,
> indeed, a claim can be debatable even though every jurist
> of reason might agree, after the COA has been granted and
> the case has received full consideration, that Petitioner
> will not prevail, Miller-El v. Cockrell, 537 U.S. 322, 338
> (2003), therefore, doubts as to whether to issue a Certi-
> ficate of Appealability should be resolved in favor of the
> Appellant, Fuller v. Johnson, 114 F.3d 491, 495 (5th Cir.
> 1997); see Buxton v. Collins, 925 F.2d 816, 819 (5th Cir.
> 1991); Buie v. McAdory, 322 F.3d 980 (7th Cir. 2003).
> If the Petitioner meets the Barefoot standard as to the
> procedural question, and shows, at least, that jurists of
> reason would find it debatable whether the ground of the
> petition at issue states a valid claim of a constitutional
> right.

Slack v. McDaniel, 529 U.S. 473, 483 - 484 (2000).


## POINT ONE

Whether Prosecutor Elizabeth K. Lee Committed
Prosecutorial Misconduct by Letting Petitioner
JOHN THAT LUONG Being Convicted And Sentenced
For The Aristocrat Robbery, When In Fact,
Prosecutor Lee Knew JOHN THAT LUONG Did Not Commit
Said Robbery, And Prosecutor Lee not only did not correct
it, but also making an argument she knows to be factually
untrue ? 5th, 14th Amendment Due Process Violation & Equal Protection
Clause Violation.

In Petitioner's 2255 Motion - Grounds Nine (9) and Eleven (11)

stated:

GROUND 9
    Whether Trial Counsel Provided Constitutionally
Ineffective Assistance When He Failed To Object
To The Prosecutor's Pervasive Misconduct

GROUND 11
    Whether Trial Counsel Provided Constitutionally
Ineffective Assistance when He Failed To Interview
And Present Witnesses In The Defendant's Defense

These grounds raise a great legal constitutional question, pursuant

to Ineffective Assistance of Counsel. See Washington v. Hofbautr, 228

F.3d 689 (6th Cir. 2000)(Trial counsel's failure to object to clear misconduct by prosecutor amounted to ineffective assistance of counsel: "one of defense counsel's most important roles is to ensure that the prosecutor does not transgress the bounds of proper conduct"); Also see Lord v. Wood, 184 F.3d 1083 (9th Cir.), Cert. denied, 528 U.S. 1198 (2000)(defense counsel failed to present testimony of three witnesses with highly exculpatory information and decided against calling them as witnesses without first personally interviewing them.); Also see Deutscher v. Angelone, 16 F.3d 981 (9th Cir. 1994) (Previous determination of ineffectiveness of counsel, Deutscher v. Whitley, 884 F.2d 1152 (9th Cir.1989), not barred by abuse of writ because ineffective counsel.). Here in Petitioner's 2255 Motion grounds (9) and (11) deal with the Aristocrat robbery, counsel was well aware of the facts concerning this robbery and that Chhayarith Reth had totally exonerated Petitioner. Also the FBI-302 Reports that stated these facts were in the Discovery package, and the prosecutor was also well aware of this fact. Once Trial Counsel Richard B. Mazer failed to call Chhayarith Reth to testify to these FBI-302 Reports, which is a glaring ineffective assistance of counsel claim by letting Petitioner to be tried and sentenced for a crime he did not commit, prejudice Petitioner and violated Petitioner's right to Effective Counsel, violating a substantive fundamental right under the 6th Amendment. Then there is a prosecutorial misconduct when (1) Prosecutor Lee knowingly used of false evidence and she sits there and let it go uncorrected. The use of false evidence is improper whether the prosecutor affirmatively elicits such evidence, see Miller v. Pate, 386 U.S. 1, 7 (1967)(prosecution misrepresented paint-stained shorts as blood-stained), or merely "allows it to go uncorrected when it

appears," see <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)(A con-
viction obtained through use of false evidence known to be such
by representatives of the state, must fall under the Due Process
Clause of the Fourteenth Amendment. The same result obtains when
the state, although not soliciting false evidence, allows it to
go uncorrected when it appears. Also in applying the rule that a
conviction obtained through use of false evidence known to be such
by representatives of the state and permitted by them to go uncor-
rected must fall under the Due Process Clause of the Fourteenth
Amendment, it is immaterial that the silence of the state repre-
sentatives was not the result of guilt or a desire to prejudice),
and <u>also</u> see <u>Morris v. Yist</u>, 447 F.3d 735, 744 (9th Cir.2006)(Failure
to investigate known inconsistencies in testimony and inability to
do so later supported inference that at lease some of witness's
testimony was false and prosecution improperly presented it); and
Prosecutor Lee knowingly makes an argument she knows to be factually
untrue. A prosecutor also commits misconduct by making an argument
the prosecutor knows to be factually untrue, even though it may be
consistent with the evidence admitted at trial. See <u>United States</u>
<u>v. Valentine</u>, 820 F.2d 565 (2nd Cir.1987)(reversal for prosecutorial
misconduct where prosecutor's argument was refuted by unoffered
evidence in the government's files). This is exactly the prosecutoral
misconduct of Petitioner Luong case. Prosecutor Lee knew that Peti-
tioner Luong had nothing to do with the Aristocrat robbery, but
she still introduced false evidence at trial on this robbery and
makes an argument based on this false evidence. Then she just sat
there silent and did not correct it. And thus this prosecutor also
violated the Brady Rule. A prosecutor has a statutory duty to turn

over exculpatory evidence. See Brady v. Maryland, 373 U.S. at 87 (1963)(Brady held that the failure to disclose material exculpatory information is a violation of due process regardless of the good faith of the prosecutor). The constitutional obligation to disclose exculpatory information is not measured by the moral culpability or the willfulness of the prosecutor. In the instant case, the prosecutor purposely withheld not to calling Chhayarith Reth to testify based on her knowledge of the FBI-302 Reports and Statements of Chhayarith Reth, and then Petitioner's trial counsel Richard B. Mazer is constitutionally ineffective and prejudice Petitioner Luong's trial by failing to object to clear misconduct by Prosecutor Lee and by not calling Chhayarith Reth to testify. These are glaring 5th, 14th Amendment Due Process Violation and Equal Protection Clause violation. See Exhibit A (FBI-302 Reports and Statements of Chhayarith Reth).

### POINT TWO

Whether The District Court "Erred" By Using Rules 602, 702, And 703 To Circumvent A 6th Amendment Constitutional Right Under the Confrontation Clause, To Allow A Expert To Testify To Laboratory Analyst Testing Of Drugs That They Did Not Do? 6th Amendment Confrontation Clause Violation

The claim in Ground Five of Petitioner Luong's 28 U.S.C. §2255 Motion states:

GROUND 5

Whether Trial Counsel Provided Constitutionally Ineffective Assistance when he Failed To Object To The Admission Of Improper Lay And Expert Testimonial Evidence?

This ground has a long list of stare decisis law out of the United

States Supreme Court that has settled all questions pursuant to a Confrontation Clause Violation under the 6th Amendment: "Is counsel ineffective by not objecting to the Government's expert witness, who testified to Laboratory Analyst Reports at trial?". According to Mason v. Scully, 16 F.3d 38 (2nd Cir.1994)(Counsel ineffective in failing to object, on hearsay and Confrontation Clause grounds, to critical testimony by police detective about inculpatory state-ment by nontestifying codefendant); Also See Mason v. Scully, 16 F.3d 38, 44 (2nd Cir.1994)(The failure to protect a defendant's right to confrontation by neglecting to object to improper testimony has been found to constitute ineffective assistance of counsel). When Trial Counsel Richard B. Mazer did not object to the Government's expert witness, who was testifying to the Laboratory Analyst Reports of the drugs they tested, is a severe trial error, and the law is clear on this legal subject. The United States Supreme Court stare decisis in Ohio v. Roberts, 448 U.S. 56, 74 (1980), overruled by Crawford v. Washington, 541 U.S. 36, 68 (2004)(That it falls upon the government to produce the witness against the accused, not the defendant to call the witness against him or her); Also in Pointer v. Texas, 380 U.S. 400, 403 (1965) and Mancusi v. Stubbs, 408 U.S. 204, 212 (1972)(State must make good-faith effort to compel presence of witness beyond merely showing witness was outside state). The 6th Amendment Confrontation Clause states: "The accuse must enjoy the right to be confronted with the witnesses against him." In this case, It is inexcusable for the prosecutor to not call the Lab Technicians who did the testing of the drugs. To bring in a expert

under F.R.Evi.P. Rules 602, 702 and 703 to have an expert testify
to the Lab Technicians Reports, circumventing a constitutional right,
afforded under the 6th Amendment Confrontation Clause, is manifest
constitutional error and manifest error. And the injurious affect
of a trial error of this nature it leaves a defendant at trial no
way to authenticate the competence of the Lab Technicians Analyst,
or testing or bare face competence, which has a great affect to the
facts of the tesing. In the United States Supreme Court stare de-
cisis in Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527 (2009)(The
only way to authenticate the competence of the Lab Analyst is through
confrontation); Also see Bullcoming v. New Mexico, 131 S.Ct. 2705
(2011). These cases all are an extension of Crawford v. Washington,
541 U.S. 36 (2004). Petitioner Luong's Ground Five has great merit,
and these constitutional violation need to be re-visited under
Judicial Jurisprudence. Pursuant to a 28 U.S.C. §2255 Motion where
a defendant's constitutional claims are dismissed without some fact
bearing hearing or an evidentiary hearing a C.O.A. should be issued
in the interest of justice based on the level of constitutional error.

## CONCLUSION

   wherefore the foregoing reasons, Petitioner Luong prays the Court
to issue a Certificate of Appealability as to each issue discussed
this Application. He forever pray's.

Date: 5/19/2015                          Respectfully submitted,


                                    By: _____
                                         JOHN THAT LUONG

CERTIFICATE OF SERVICE

    I, JOHN THAT LUONG, hereby the undersigned, certifies that on the date below a true and correct copy of the foregoing was conveyed to prison authorities for mailing in accordance with the prison legal mail policy with First Class U.S. postage prepaid and properly addressed to the following party:

W.S. Wilson Leung
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102-3495

Date: 5/19/2015               Submitted by,

                            JOHN THAT LUONG
                            Reg. # 08838-097
                            U.S.P. Canaan
                            P.O. Box 300
                            Waymart, PA 18472

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    7-27-98

On July 17, 1998, Chhayarith RETH (protect identity) was interviewed by Special Agents Timothy Doran and Nelson Low, San Francisco FBI, at Santa Rita Jail, Alameda County Sheriffs' Office, Pleasanton, CA. Assistant United States Attorney (AUSA) Elizabeth Lee, San Francisco US Attorney Office and John Runfola, representing Chhayarith RETH (protect identity), were also present during the interview.

Before beginning the interview of RETH (protect identity), AUSA Lee discussed the terms under which the statement would be made. A written agreement was reached which was signed by the parties.

Reth advised of the following information:

Reth stated that he worked with the "foundation" and was familiar with the activities committed by and/or on behalf of the "foundation". Reth advised that the "foundation" originally consisted of individuals to include Mady, Kevin, Donovan, and Andy. These individuals initially collaborated together in the commission of burglaries of computer companies in the San Jose and Fremont areas. Later, armed takeover robberies were committed at computer computers resulting in significant financial gains for "foundation" members and associates.

Reth provided cursory information concerning the following burglaries and robberies:

Burglary - Micro Distribution

Participants in the burglary of Micro Distribution included Mady, Donovan, Kevin, and Kevin's brother.

Burglary - BJS

Nam Pham was one of the participants in the burglary of BJS. Pham had an understanding or knowledge of security/alarm systems.

97,225

Investigation on  7-17-98    at  Pleasanton, CA

File #  281E-SF-111963    Date dictated  7-27-98

by  SAs Timothy Doran and Nelson Low

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of  **Chhayarith Reth**               , On **7-17-98**    , Page    2

### 1994 Robbery - Teg Micro

Mady, Kevin, Donovan, Reth and others were involved in
the robbery of Teg Micro. Reth advised that Mady and Kevin
collaborated with someone who worked at Teg Micro who provided
inside information about the company. Reth also advised that
prior to the execution of the robbery, he was told that $20,000
cash would be in a safe at the company which was slated to be
"payoff" money to Mady and Kevin for robbing the business. Reth
advised that he found the company safe and took the $20,000
during the robbery.

Reth advised that he believed that the Teg Micro
robbery was an "insurance fraud" robbery.

### 1994 Robbery - Golden _____, Fremont, CA (near a McDonald's Restaurant)

In the course of robbing this business, Reth advised
that he took a Honda sedan belonging to a female after the
robbery because Kevin, who was driving Donovan's RX-7, failed to
pick up Charlie when it was time to leave the crime scene.
Subsequently, Reth and the other participants in this robbery met
at Mady and Donovan's apartment in Pleasanton, CA. Reth had
driven the stolen car to the apartment and parked same in the
apartment parking lot. Mady, not wanting the stolen car to be
associated with the apartment, had the vehicle moved to a
shopping center parking lot where it was abandoned there. Reth
advised that an individual known as Hong (phonetic), Vietnamese
male, 16 - 17 years old, drove the vehicle to the shopping center
parking lot.

Reth advised that Mady and Donovan's apartment can be
located because the Pleasanton Police questioned Mady concerning
an accidental gun discharge incident which happened in the
apartment. Reth advised that during this incident, Benji was
playing with a gun when the gun was discharged accidentally. A
neighbor called the police because the bullet had penetrated the
wall(s) and lodged in the neighbor's apartment. Reth advised
that investigating officers questioned Mady who made a statement
concerning the incident.

97,226

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of ___Chhayarith Reth_____ , On __7-17-98____ , Page __3__

Robbery - Aristocrat

        Reth advised that four Cambodians assisted him in the robbery of Aristocrat.

        Reth also advised "foundation" members Mady and Donovan opened a business known as Challenger Computer using an individual known as Ron Chan to help run day to day operations. Reth advised that Andy supplied computer equipment to Challenger Computer to give the appearance of a legitimate business. Reth advised that the business regularly received stolen property comprising of mostly computer components and related equipment.

        At the conclusion of the interview, Reth advised that he believed that he was involved with approximately 12 - 14 robberies. Additional details concerning Reth's knowledge of the "foundation" and his involvement in robberies will be obtained subject to Reth and his attorney(s) concurrence to further interview(s).

97,227

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    4/8/99

On April 3, 1999, Chhayarith Reth, also known as Charlie, date of birth February 27, 1967, was interviewed at ▮▮▮▮▮▮▮▮▮▮▮▮. Present during the interview was Reth's attorney's Dean D. Paik and Manish S. Shah and Federal Bureau of Investigation (FBI) Special Agents (SAs) Stephen C. Laycock and Nelson Low, San Francisco Division. After being advised of the identities of the interviewing agents and the purpose of the interview, Reth and his attorney's was given a proffer letter which both Reth and Reth's attorney, Paik, signed. Reth then provided the following information:

Reth stated that he met Mady, Donovan, and Kevin Liu around 1992 or 1993 when Mady worked as a hair cutter. Reth, at that time, was working as a teacher's aid. Reth frequently shot pool at "Naughty Nap" where he would run into Mady shooting pool and gambling. Reth saw Mady hanging out with a group of Vietnamese guys.

Reth heard from some of the Vietnamese guys that Mady was involved in the burglary of Micro Distribution. During this period, Reth saw Mady change from average dress to wearing nice clothes and driving nice cars.

Reth identified Mady's group as consisting of: Sophat Laem, Ducktail, and Rainman. Reth stated that Rainman owned a green Legend that at one time had been chased from Stockton to Sacramento by the police. Rainman abandoned his car after the chase and was eventually arrested when he called the police to report his car missing.

Reth knew a guy named Benji whom Reth knew was from San Francisco. Reth described Benji as a "crack head". Benji also had a group which consisted of Hang, and Duc.

Reth indicated that Duc had a confrontation with "Catfish's" group at the Naughty Nap where Duc shot a member of "Catfish's" group in the neck. Reth believed that the person may have died from the shooting.

---

Investigation on    4/3/99    at Oakland, CA

File #  281E-SF-111963 / 281E-SF-120693    Date dictated    4/8/99

SA Nelson Low
by  SA Stephen C. Laycock: ▮▮                                              97,233

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; the contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

281E-SF-111963; 281E-SF-120693

Continuation of FD-302 of ___Chhayarith Reth_____ , on _4/3/99___ , Page __2__

    <u>Challenger Computer International (CCI)</u>: Ronald Chan and Mady Chan opened CCI and later planned to have their own store robbed to make money on the reported stolen computer parts as well as the insurance money. Mady eventually lost trust in Ronald because Mady wanted their business robbed but Ronald would never set it up. Mady recruited a technician from Delta College and hired him to work at CCI. CCI was eventually robbed by people hired by Mady for the insurance money. Andy Chu was the buyer of the product that was taken in the robbery.

    Ronald had an apartment in Riverbanks in Stockton. Ronald was in the real estate business, had a Stockton apartment at "Riverbanks", and had a contact for apartments.

    <u>PC TEN</u>: Andy Chu owned PC TEN which located on Davis Street in San Leandro at the Westgate shopping center. PC TEN was a set up robbery agreed to by Andy Chu for insurance money. Andy asked Mady to organize the robbery. Reth, Benji and Hang were the inside crew for the robbery while Donovan, Mady, and Kevin were lookouts during the robbery. Andy was not at PC TEN when the robbery occurred; however, there were three employees present during the robbery. Reth described one of the employees as Indian.

    Reth advised that the employees that were present did not know that the robbery was set up by Andy Chu. During the robbery, one employee began laughing during the robbery because Benji was laughing. Reth advised that Benji was laughing because it was an easy set up robbery. When Chu showed up, Donovan approached Chu outside of the business and advised him that the robbery was taking place. Chu drove off until the robbery was over. Reth and Benji carried guns during the robbery which were provided by Mady. They used duct tape to secure the employees.

    During the robbery, Benji could not open a cabinet inside the business. Mady then entered the store and helped Benji open the cabinet. Mady covered his face while inside so the employees would not recognize him.

    Andy Chu arrived at PC TEN while the robbery was in progress. Donovan approached Chu outside of the business and

97,234

FD-302a (Rev. 10-6-95)

281E-SF-111963; 281E-SF-120693

Continuation of FD-302 of ___Chhayarith Reth_____ , On __4/3/99__ , Page ___3__

advised him that the robbery was taking place. Chu drove off
until the robbery was over. Reth indicated that Chu did not know
that Mady had orchestrated the robbery at this moment because
there had been so many delays caused by Chu that Mady decided to
do the robbery without telling Chu.

Reth advised that the crew was only able to take ten or
fifteen computer monitors from PC TEN which were taken directly
to CCI. Reth indicated that Chu had already removed some of the
property prior to the robbery and moved it to CCI.

Prior to the PC TEN robbery, Reth met at Jimmy's house
in Stockton for instructions on how the robbery was to take
place. Reth then picked up Benji and Hang and drove to the
robbery. Benji and Hang had obtained a truck to use in the
robbery. Mady provided a gun for Benji for the robbery. Reth
recalled that "Rainman" was also present during the PC TEN
robbery. During this time, Mady owned a red Toyota pick up with
a stolen cap on the back.

Reth advised that he was not paid for doing this
robbery (PC TEN).

Reth also advised that Chu was involved with the
purchase of the product taken during the Comtrade robbery and
shipped same to another buyer in Miami, Florida. Reth added that
Chu was slow in paying the crews after robberies. Chu's computer
company was drawing approximately $5,000 per week making it
difficult for Chu to pay Reth and the other crew members promptly
after robberies.

Additionally, Chu gave robbery targets to Mady and
Donovan and Mady and Donovan would provide the guns for the
robberies.

"Am Sung" (phonetic): Reth stated that "Am Sung"
(phonetic) provided guns to Jimmy and Jimmy provided the guns to
Mady and Mady would give out the guns to the crew members. Reth
indicated that Mady also had a bullet proof vest. Reth stated
that "Am Sung" controlled a Vietnamese group in Stockton.

Reth stated that Wingman, who Reth said is Sophat Laem,

97,235

FD-302a (Rev. 10-6-95)

281E-SF-111963; 281E-SF-120693

Continuation of FD-302 of __Chhayarith Reth_____ , On __4/3/99__ , Page __4__

and Rainman had done robberies for Mady before Reth got involved. Ducktail's group, from San Francisco, got busted for a robbery of UPS.

    <u>Attempted jewelry store robbery:</u> Reth stated that this attempted jewelry store robbery occurred in Arcadia, CA prior to the PC TEN robbery. The crew included Reth, Mady, Donovan, Ben, Benji, Hang, Bun and Dob. Dob owns a computer store located behind the International Club in Southern California. The crew stayed at the Holiday Inn. The robbery was to start as a home invasion at the jewelry store owner's house where they would get the owner and take him back to the jewelry store and then rob it. Reth indicated that the robbery did not go as planned. Reth used his former girlfriend's car for the robbery. Reth identified the girlfriend as Melissa who worked at the Cache Creek Casino. Reth advised that Melissa's true name is Muang Chong Saephan.

    The crew went directly to the jewelry store. Reth entered the front door first while Hang and Benji entered through the back. Hang and Benji tied up the employees with duct tape. When Bun entered, he took some diamond rings but could not locate a specific diamond which they wanted to steal.

    Reth recalled that Bun began sexually assaulting a female employee during the robbery. Bun searched her body and then had her remove her clothing after which he groped her.

    Benji had parked the car on the sidewalk near the jewelry store. When he and others exited the store and began running toward the car, a police cruiser noticed them running toward the car and stopped at the car. Reth exited out through the rear of the store when he saw the police car. Reth jumped a wall behind the jewelry store and went to a Kentucky Fried Chicken where he asked a customer for a ride. The customer gave Reth a ride; however, when the car was stopped at a red light, a police officer who had seen Reth walking from behind the jewelry store spotted Reth in the car. The signal light changed before the officer could approach the car; Reth was able to elude the police and avoided arrest.

    <u>Bob at Excel:</u> Reth indicated that he dealt with a man named Bob who owned Excel Computers in Sacramento. Bob gave Reth

97,236

FD-302a (Rev. 10-6-95)

281E-SF-111963; 281E-SF-120693

Continuation of FD-302 of   Chhayarith Reth                         , On 4/3/99     , Page   5

names computer chip companies to rob.  Smart Computers, Micro
Distribution, and Alpha Systems were among the companies provided
to Reth by Bob.  Smart Computers was on the list and the crew was
going to rob it but the robbery never took place.

        Micro Distribution was given as a robbery target but
Vanthien and Ding Dong (Dung Nguyen) had already robbed it.  Reth
advised that Vanthien called Reth, who at the time was at Peter's
house, while he (Vanthien) was robbing Micro Distribution.  Reth
indicated that Vanthien called Reth to advise Reth how the
robbery was going.

        Bob also gave Reth Alpha Systems as a target and Mady
confirmed the location.

        Reth stated that Bob bought computer chips after
robberies to include: Micro Distribution, Valtrix, PC Team, CMC,
as well as from places that Vanthien robbed. Reth stated that Bob
bought approximately $60,000 worth of computer chips from the
Micro Distribution robbery; $15,000 - $20,000 from the Valtrix
robbery; $20,000 -$25,000 from the PC Team robbery; and $30,000
from the CMC robbery.  Bob would sometimes pick up the product
from Reth's residence; Reth delivered the product to Bob's
computer business, Excel, most of the time.  Reth noted that Bob
always paid cash for the product.  Additionally, Reth advised
that Reth's former girlfriend, Melissa, (identified above) was
sometimes present when Reth provided Bob with product.

        Reth's pager number and cell phones; Kim (Kim Ngo):
Reth advised that a pager number that he used in the past
includes 209/547-6294 with service provided in his friend's name,
Bora (phonetic).  Reth advised that he dated a girl, Kim, from
Los Angeles for a couple months and during this time Kim
purchased two cellular phones for him.  One phone was portable
and the other was a car phone for his Lexus.  Reth described Kim
as a USC student and a roommate of Mark's girlfriend.  (Reth
identified a photograph of Kim Ngo, #1166, as Kim.)  Reth advised
that the phones were purchased in Los Angeles and had Los Angeles
phone numbers.  Reth advised that the Lexus that he owned was in
his dad's name.

        Reth specifically recalled that Kim drove him to and
from the Zenon and Maximus robberies.  Reth advised that he paid

                                                    97,237

FD-302a (Rev. 10-6-95)

281E-SF-111963; 281E-SF-120693

Continuation of FD-302 of ___Chhayarith Reth_____ , On __4/3/99___ , Page __6__

Kim for helping in the robberies and she was paid as much as $10,000 on one occasion. Reth advised that Kim was caught with several thousand dollars, possibly $10,000, when the police busted a night club in Los Angeles area.

Additionally, Reth stated that Kim would sometimes drive him to and from robbery locations in the Los Angeles area. Kim, at Reth's request, took a $300 or $500 cash advance on her credit card to give to Phim Phay John so Phim Phay John could purchase a gun.

Aristocrat, Data Pro, and Piiceon robberies: Reth indicated that there was a Cambodian gangster, Ah Shoung (phonetic), who was involved in three computer chip robberies - Aristocrat, Data Pro, and Piiceon computer companies. Reth described Ah Shoung as sponsoring three movie actresses, and lived in a duplex with a member of Ah Shoung's crew, identified as "Reth" (different from interviewee). Reth indicated that a third member of Ah Shoung's crew was "Ton", a Cambodian male from Modesto whose brother was a Modesto police officer.

Reth, along with Freeman and Minh participated in the Piiceon robbery which was ordered by "John" (John Luong). As the participants executed the robbery, the crew had to use bolt cutters to cut the cage at Piiceon because there were no employees at the company when they proceeded with the robbery. They waited for the owner to arrive but did not arrive soon enough. The crew stayed at a Pleasanton, CA Motel 8 at some point around the time of the robbery.

Reth indicated that while he was in custody in the Santa Clara case, Ah Shoung and the rest of his crew committed a home invasion robbery in Modesto where five crew members were arrested by the Modesto Police. Reth indicated that the crew entered a home and took the family hostage. The father owned his own company and the purpose of the home invasion was to get information on the owners company to proceed with the robbery of the company. Someone tipped the police resulting in the police's response to the residence. The daughter of the father, an eleven year old, was supposed to go out to the police and tell the police that everything was okay and that the people inside were friends. However, when the girl went out to the police, she told

97,238

FD-302a (Rev. 10-6-95)

281E-SF-111963; 281E-SF-120693

Continuation of FD-302 of ___Chhayarith Reth_____, On _4/3/99_, Page ___7___

them that they were being robbed. The crew was arrested by the police.

Reth indicated that the case did not go to trial because "Ton", described above, threatened the witnesses which caused them to leave town. The case was dismissed.

Steven, Oakland "dai lo": Reth advised that Steven is a "dai lo", in Oakland's Chinatown. Steven reportedly used to extort a bakery located on Webster Street in Oakland Chinatown. Steven speaks Cantonese and Mandarin. One of Steven's followers was identified as "Freeman" who participated in the Piiceon robbery and carried a gun during the robbery. Reth advised that Freeman also participated in the Hokkins robbery.

Donovan, Mady, and Nam Pham: Donovan, Mady, and Andy Chu (see PC Ten) were the original group involved with burglaries and robberies of computer businesses. Donovan was the enforcer, the guy who talked tough, and Mady was the finesse guy. Both Donovan and Mady worked closely Andy Chu who was a buyer of stolen property taken in burglaries and robberies.

Reth did not like Donovan because Donovan once put a gun to Reth's head. Reth advised that the incident occurred because Reth had broken Donovan's car windshield.

Both Donovan and Mady were involved in the robbery of Micro Distribution. Nam Pham, who burglarized BJS Computer Company, knows Donovan and Mady well. Nam Pham bought the product from the Piiceon robbery from John (Luong).

Donovan and Mady have both been known to use cocaine. Donovan has a girlfriend who lives in Sacramento.

Jay: Jay, a Cambodian male, who was part of the robbery crew, wanted to start a credit card scheme and cloning cellular phones. Jay stole credit cards and bought computer equipment for CCI. Jay also manufactured counterfeit checks to help support the robbery crew.

97,239

FD-302a (Rev. 10-6-95)

281E-SF-111963; 281E-SF-120693

Continuation of FD-302 of   Chhayarith Reth _____ , On 4/3/99 _____ , Page   8 ____

    **Miscellaneous:** Donovan purchased a restaurant on Charter Way in Stockton, CA using proceeds from the sale of stolen merchandise taken in the Micro Distribution burglary. Donovan also bought a 3000 GT for his girlfriend and a Nissan for his mother from the proceeds of the Micro Distribution burglary. Donovan's girlfriend lives in the Sacramento area.

    A robbery attempt was made of a shark fin business in San Francisco.

    Mady organized the robbery and provided the crew for the PC Team robbery in Fremont, CA. The crew consisted of "Froggy", Ah Thi, "Cartoon", and a Mexican guy who lived on Manchester in Stockton, CA. Cartoon was later arrested in a bank robbery.

    Donovan and Mady rented an apartment in Pleasanton, CA. The robbery crews stayed at the Pleasanton apartment before some of the robberies. One evening, while at the apartment, Benji accidentally discharged a Berretta firearm into the wall. The police responded to the incident and made a report regarding the shooting.

    Mady has a second wife, Jillian, who was given a black Legend from Mady. Mady later gave Jillian a Mercedes. Additionally, Reth advised that Mady gave Jillian $200,000 cash after the Centon robbery. Jillian was believed to have used the money to help finance an import/export business with which she was involved.

    Reth recalled an occasion in which he went to the Sacramento Airport to pick up John (John Chu). Reth was in a second car and was used as security because John (John Chu) was arriving with $400,000 cash in a suitcase. Reth added that he was often used as a driver for Mady.

    Mike (Mike Chiang) purchased computer chips after the Centon robbery.

    Mady used to work at Micro Land, a computer business in San Jose. Donovan decided to rob Micro Land after Mady quit working there. Something went wrong during the robbery and the

97,240

FD-302a (Rev. 10-6-95)

281E-SF-111963; 281E-SF-120693

Continuation of FD-302 of ___Chhayarith Reth_____, On _4/3/99___, Page ___9___

    owner of the company believed that Mady set up the robbery
attempt.

        Mady's father-in-law owns a business known as Vinh Phat
(phonetic). Mady's family purchased homes together on a cul-de-
sac with money he obtained from the proceeds of computer chips
and product taken in computer chip burglaries and robberies.

        Reth stated that there was a car dealership called T
and G (T and G Autos) where the Chinese owner sold cars at a
discount price to select buyers. Rainman bought a green Legend
there; Reth bought his BMW there; John Luong and Mady both bought
Mercedes there. Mady also purchased Reth's black BMW.

        Reth indicated that there were several different
robbery groups operating at one time. One group was led by
Vanthien, one by Mark, and one by Dung.

        Reth advised that he did not own a donut shop but that
he had put some money into a donut shop. Reth eventually pulled
his money out of the deal because he lost so much money gambling.

97,241

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription      6/5/99

On June 3, 1999, Chhayarith Reth was interviewed by Special Agents Nelson Low and Carol Lee. Also present during the interview was Reth's attorney, Dean Paik. Reth advised of the following information:

**Background information**

Before becoming involved in robberies with Mady and his associates, Reth advised that the first participants/associates who committed criminal activity with or for Mady included Sophat, Rainman, and Ducktail. Benji joined the threesome later. Reth noticed that the Mady and the now foursome had a lot of money and wanted to become involved with the group to make some money.

Reth was eventually allowed to participate during which Reth worked/committed robberies with a number of people, mostly Cambodians, who hung out at Lewis Park. The Lewis Park people included cousins Andrew and Roni, Ding Dong, Baloney, Loi (Lloyd), Ja, Short Hmong Joy, Vannel Kim, Ryan, Iceman, Ray, Froggy, Cartoon, "T", PJ, Sang, Captain, Johnny Gia Tram, Mark, and Hardhead.

Initially, Donovan, his brother Edmond, and Mady committed burglaries of computer companies. Later, Edmond began working with Ben from Los Angeles during which they became involved in an attempt robbery where the victim/owner of a business was taken hostage in his vehicle. The victim/owner got away during the robbery and the robbery attempt was aborted.

Mady and Donovan later parted on separate ways because Mady did not like Ben who was working closely with Donovan.

Subsequently, problems developed between Catfish's associate who worked closely with Om Soon and Sophat's people who worked closely with Mady. A shoot out had occurred at the Carrington Apartment, Stockton between the two factions which culminated in a sit down around the end of 1994/beginning of 1995 which was mediated by Om Soon along with Jimmy, an associate of Om Soon from the past. An agreement was reached which settled the difficulty(ies) between Catfish and his associates with

Investigation on    6/3/99         at  San Francisco, CA

File #  ▓▓▓▓▓▓▓▓▓▓▓▓

by   SA Nelson Low              Date dictated   6/5/99

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

97,661

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   Chhayarith RETH

, On 6/3/99 .   Page 2

Sophat and his associates.

## Robbery of Shark Fin business, San Francisco, CA

One of Reth's first robbery for Mady was a shark fin business, which occurred sometime around January 1994 in San Francisco, CA. Reth advised that Benji had persuaded Mady and Donovan to agree to commit the robbery in which the intent was to take the shark fin from the victim business and have it resold at the Vinh Phat Market in Sacramento, CA.

Reth advised that he (Reth), Benji, and Hang committed the robbery - Benji and Hang had guns during the robbery. The trio used a white Dodge Colt belonging to Ducktail's brother as transportation. They drove from Mady's house to Donovan's restaurant and onto San Francisco to commit the robbery. Upon arrival at the victim business, Benji knocked on the door or rang the doorbell to gain entry. Once he was able to gain entry, Benji let Hang in who then let Reth into the business.

Benji displayed his gun and announced the robbery and ordered everyone onto the floor. The 3 or 4 victims, 1 female and 2 or 3 males, complied with the order. Benji then handed his gun to Reth who was told to stand watch over the robbery victims. Benji then proceeded to walk around the business looking for cash register(s) when he was supposed to be looking for sharks fin.

An employee, possibly in another section of the business, who had not been secured activated the fire alarm as the robbery was in progress. Upon the alarm activation, Benji, Hang, and Reth immediately fled from the scene. Due to the hasty departure, the trio was unable to obtain any sharks fin or other property of value.

Reth noted that Benji was a "dopehead" whose judgement has been affected by his drug use. Presently, Benji is believed to be in Bakersfield on an INS hold/matter.

## Attempt robbery of BJS Computer company - Jan/Mar 1994

Bosses-

Mady, Donovan, and Kevin;  Robbery target given by Andy

97,662

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Chhayarith RETH_____

to Mady                                                    , On _6/3/99_ ; Page___3___

Crew Chief-

        Benji

Crew Members-

Eureka     Benji, Hang, Binh, Duc, Reth, Michael - a cook from

Guns-

        Benji - .357 revolver
        Hang - .45 semi automatic pistol

Truck rental-

        U-Haul rented in Stockton, CA on Tam O'Shanter;
possibly rented by Duc

Vehicles-

        White Dodge Colt - belongs to Ducktail's brother
        Mitsubishi Diamante - Mady's vehicle
        Black Datsun 240 SX - Kevin's vehicle

Lookouts-

        Mady, Kevin, Donovan

Entry group-

        Benji and Michael walked to the door and attempted to
enter the business.  An employee would not open the door; Benji
and Michael departed from the scene in the white Dodge Colt.

Finder/loader-

        Reth

Delivered to-

97,663

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___ Chhayarith RETH _____ , On 6/3/99 ____ , Page ___ 4 ___

Not applicable - attempt only/unsuccessful robbery

Sellers-

Mady, Kevin, Donovan

Buyers-

Andy

Motel/hotel-

Not applicable - none used

Additional comments-

The robbery attempt was unsuccessful because an employee denied Benji and Michael entry into the business. The anticipated gain from the robbery was estimated to be approximately $500000 to $1 million in computer product. Discussion concerning the robbery was conducted at the Panda Garden restaurant where Mady's brother worked. Mady told Benji to buy duct tape and gloves to use during the robbery; duct tape purchased by Benji was brought to the robbery for use by the crew to secure the victim(s).

The robbery crew started the robbery attempt from the Panda Garden (Stockton, CA) and drove to BJS (San Jose, CA) to commit the robbery. After arriving in the area of BJS and before actually attempting the robbery, Kevin drove Reth and Benji around BJS several times to familiarize them with the business and surrounding area. Kevin drove Reth and Benji around in Kevin's Nissan 240SX. As noted earlier, the robbery was unsuccessful because Benji and Michael were denied entry into the business.

<u>Hokkins Robbery</u>

Bosses-

Jimmy, John, and Mady; Robbery target was given by Andy. Mady introduced Reth to John from New York who was present during a pre-robbery meeting with 2 other individuals. John gave

97,664

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     Chhayarith RETH

Reth some background about himself (John).                      .on 6/3/99    . Page  5

Crew Chief-

          Charlie, Ding Dong; Reth noted that Ding Dong started
working with Reth during either the Memory Source or Hokkins
robbery.

Crew members-

          Charlie, Ding Dong, Nghia, 4 "Oakland boys"

Guns-

          Ding Dong - 9mm or .45 semi automatic pistol
          Nghia - unknown handgun
          Additional guns also possibly used

Truck rental-

          U-Haul van obtained by the Oakland crew who may have
rented the van in Berkeley

Vehicles-

          Jimmy's BMW
          John's white (?) Toyota Camry
          Possible rental car
          Other unknown vehicle(s)

Lookouts-

          Jimmy - in his BMW
          John - in his white or light color Toyota Camry

Entry group-

          Nghia and Ding Dong

Loaders-

          "Oakland boys"


                                                    97,665

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    Chhayarith RETH    , On  6/3/99  , Page  6

Delivered to-

    Kevin drove the U-Haul van to Sacramento and delivered the stolen property to Jimmy's father's house located in the area off I-99, Laguna exit. The stolen property consisting of CPUs, DIPs, hard drives, and SIMMS were unloaded from the U-Haul van into the garage by Reth, Mady, Kevin, Linda's sister's husband from Seattle, and Jimmy

Seller(s)-

      Mady

Buyer(s)-

      Andy

Motel/hotel-

    Not applicable - none used

Additional comments-

    Upon arrival in the area of Hokkins, Ding Dong and Reth waited in a business parking lot adjacent to Hokkins while last minute maneuvering was conducted. Ding Dong and Reth had a cell phone for communication with the other participants in the robbery. A number of cars were still parked in the parking lot/area of Hokkins when they first arrived. As such, John wanted to wait until the number of cars in the lot had decreased before proceeding with the robbery.

    Reth noted that he saw the target business and wanted to proceed with the robbery the same day.

    Subsequently, Ding Dong and Nghia joined together and waited in a car or by some bushes along the business. Operating under cover of darkness, Ding Dong and Nghia approached the owner and pulled guns on him when he exited the business. The owner was forced back into the business. Reth received a call from Ding Dong on a clone cell phone provided by Jimmy or John; Reth was told the alarm code had been entered. Reth waited 5-10 minutes and did not see any police response to the scene during

97,666

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Chhayarith RETH__

_____ this time.                                    On _6/3/99_ , Page __7__

Nghia opened the back door after which Reth entered the business. Reth saw the owner opening safes; he also noted that the owner's hand was bloody. Reth then had contact with Jimmy via phone during which Jimmy was told to have the U-Haul van proceed to the back door.

The van was driven to the back door after which 3 unknown males, Oakland boys, exited the van and entered the business. The driver of the van remained in the vehicle. Reth worked with the 3 unknown males and told them which items to take from the safe.

Later, Reth saw Ding Dong in the bathroom tying up the owner with cable ties which had been brought by the Oakland boys. The owner, described as a balding 50 +/- yr old Asian male, was secured to a disability bar in the bathroom. Reth noted that Ding Dong was wearing black leather gloves during this time. After securing the owner, Ding Dong was told to go to the safe area to help load product from the safe into the U-Haul van. A large number of CPUs was taken including 2 boxes of 486 CPUs.

Reth apologized to the owner for his injury and told the owner that they only wanted to take his property for which he could recover the loss through insurance compensation. Reth was picked up by Jimmy from the back of the business after the U-Haul van departed from the scene.

Mady sold the stolen property for approximately $400000; some of the stolen property was sold to Andy. Reth received $3000 from Mady following the robbery to "celebrate". 3 or 4 days later, Reth received another payment of $20000 which he gave to Ding Dong. Over a series of approximately 5 payments, Reth advised that he received approximately $60000 for his participation in the Hokkins robbery; Ding Dong received approximately $40000.

Reth noted that Jimmy and Mady had an argument about splitting the robbery proceeds - Jimmy wanted ¼ of the stolen property which was not agreeable with Mady. Reth could not elaborate further on the outcome of this argument.

97,667

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Chhayarith RETH_____ , On _6/3/99_____ , Page ___8___

## Robbery of UPS truck

Reth advised that approximately 1 year prior to the robbery of Centon (Electronics), a robbery of an UPS truck was committed after the driver had made a pick up at Centon. The driver was en route to another business when "T", Sang and others (phonetic) from "Froggy's" group "jacked"/robbed the UPS truck. The driver was tied up/secured by Sang who put the driver in the back of the truck as "T" drove the truck. After driving for a short time, the truck was parked in another area. The robbery participants then went through packages in the truck which resulted in their finding football gear and a minimal amount of computer product.

## Aristocrat robbery

Bosses-

Mady, Kevin, and John Chu

Crew Chief-

Reth

Crew members-

Sar who looks like Elvis, approximately 5-7; Ho; possibly Bora (phonetic); Sam who was a driver; Than (phonetic)

Guns-

The 2 handguns taken/recovered by the police when Reth was arrested by the Stockton Police were guns used during the robbery of Aristocrat.

Vehicles used-

Green Crown Victoria rented by Vannel Kim and used by Reth during the robbery

Additional comments-

The robbery was a "no look" robbery meaning Reth had

97,668

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Chhayarith RETH_____, On 6/3/99 , Page 9

not done any prior preparation for the robbery such as a drive by to familiarize himself with the business, general area, escape routes, etc. Reth was told that there was supposed to be a morning delivery to the business; as such, the robbery was committed in the morning.

Reth advised that once the decision was made to proceed with the robbery, he went to the door and asked for someone. The employee told Reth that the person did not work at the business any longer. By then, Reth had managed to gain entry after which he committed the robbery with the assistance of his associates.

After fleeing from the victim business, Reth delivered the stolen property to Mady who took it to Linda's brother-in-law's house in the Sacramento area. Linda's brother-in-law had ties to the Seattle area at one time.

## Wintech robbery

While Reth was in custody in Santa Clara County jail with Michael LUU, Reth learned from LUU that he (LUU) tried to commit the robbery of Wintech during which LUU and his girlfriend, Iris, were arrested. During their discussion, LUU advised that he knew a Lawrence WONG. LUU related that according to Tak TRAN (phonetic), WONG was not a buyer for the property which was to be taken in this robbery. Based upon Reth's experience, LUU sought information from Reth on how Reth was preparing his (LUU's) defense.

## Unimax robbery - San Jose, CA 1996

Reth advised that this robbery involved the kidnaping of the wife to Tak TRAN (phonetic). Reth learned that TRAN was told to not identify "Joy" in a line up; and, TRAN contacted his wife to not make a court identification of "Joy. As such, Joy was discharged from the case and released from custody.

## Information concerning various individuals

## John CHU

Reth met John CHU after the robbery of Alpha Systems. CHU works with Billy or Bill who was a "connection" for potential

97,669

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Chhayarith RETH_____, On _6/3/99_, Page __10__

robbery targets.

**Andy CHU**

A robbery was committed at Andy's business in which
Andy allowed his business to be robbed as part of an insurance
scam. This robbery is believed to have occurred sometime around
March 1994.

**Ding Dong**

Reth described Ding Dong as a polite, quiet, and non-
violent person. Reth advised that Ding Dong learned the robbery
business from Reth.

**Linda**

Linda, wife to Mady, knew what was going on with Mady
with regard to his involvement in the burglary and robberies of
computer businesses. There were times when she was present at
the hotel while robberies were committed by Mady and his
associates. Reth contacted Linda periodically who relayed Reth's
messages to Mady.

Reth believed that Linda's attitude about police
officers was not very positive - it is unlikely that she will
cooperate with law enforcement officers.

**Donovan**

Reth knew Donovan who was present during some robberies
of computer companies. Reth did not work for Donovan because
Reth felt Donovan was greedy and did not like his tactics.
Donovan thought he was smarter than most of the people involved
and "ripped people off".

Donovan's girlfriend is Angel who worked at a bank
before.

**Jillian**

Though married to Linda, Mady had a girlfriend,
Jillian, who lived in San Francisco. Jillian was described as

97,670

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of __Chhayarith RETH__ , On __6/3/99__ , Page __11__

someone who loves Mady very much and would do anything for Mady.
Mady wanted to leave Linda at one time but did not because of
financial considerations - everything Mady owned was in Linda's
name.

        Jillian wanted to "share" Mady but Linda would not
agree to the suggestion. At one point, there was competition
between the two ladies in giving birth to children fathered by
Mady. Jillian was unlikely to cooperate with law enforcement
because of her love to Mady.

        Reth noted that following the successful robbery of Teg
Micro, the stolen property was driven to Jillian's house in San
Francisco. Mady used the robbery operation as cover for him to
be with Jillian. As the stolen property was en route to
Jillian's house, Mady had the vehicle wait at the McDonald's near
Jillian's house. Mady then met with the people in the delivery
vehicle and led the way to Jillian's house. Her house is off I-
280 where there are some railroad tracks.

        Jillian's home phone was 415 584-0722 which Reth called
collect while in Santa Clara County jail. Since Reth could not
reach Mady, he contacted Jillian to relay his concerns to Mady.
During a conversation with Jillian, she advised Reth not to worry
since Mady was willing to "take care of you". Reth advised that
he received $10000 from Mady to help pay for his attorney
representing Reth in the Santa Clara County case.

        In a separate matter, Jillian stayed at the Shilo Inn
in the area of Industry, CA as the group prepared to commit a
robbery of the Maximus Computer company. Jillian reportedly used
her credit card to reserve and/or pay for the room.

__Victor__

        An older Chinese male who was brought into the robbery
group during the Data Pro robbery. Victor can be found at the
Delta or Cameo Card rooms. Victor's responsibility during the
robbery was to drive around and assist with the robbery as needed
by the robbery crew.

__Micasa (phonetic) Mike - Pai Gow poker__

                                        97,671

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  Chhayarith RETH _____ , On 6/3/99 _____ , Page  12

A Vietnamese male who hung out at the Delta Card room.
Mike committed a robbery with Reth at one time.

Jay

Jay is a Cambodian male and the ex-boyfriend to
Melissa. He participated in the attempt robbery of Viking
Computers in the Los Angeles area during which customers were
chased in the business by Jay during the robbery.

Jay is also involved with fake/counterfeit credit cards
and checks and cloning telephones.

International Card room, Stockton, CA

The International Card room at California and Webster
Streets was opened by Mady, Kevin, and Donovan for a short time.
Evidence of cheating was occurring at the card room and resulted
in the forced closure of the card room by local authorities.

Charlie Reth

Reth liked working for John because John took care of
Reth and also provided "back up" when Reth was in need of help.
Though Reth worked with Mady for a time, Mady still "respected"
Reth after Reth began working for John.

Though Reth knew Jimmy, he did not work directly for
him.

Bail money for Reth following arrest for robbery, Santa Clara
County - Aristocrat robbery

After Reth's arrest for the robbery of Aristocrat
Computer Company, Reth contacted Mady through 3 way calls to
Vannel Kim. Through the 3 way calls, Reth told Mady that he
needed help to hire an attorney to represent Reth. Reth needed
money for an attorney to which Mady agreed to help. An attorney,
Cassidy, was hired but did not work out and was released by Reth.

Another attorney was sent by Mady to Reth who contacted
Reth while he was in jail. The attorney passed a note to Reth

97,672

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Chhayarith RETH_____ , On __6/3/99__ , Page ___13___

indicating his retention fee of $50000 and an overall charge of
$100000 to represent Reth through the prosecution.

Reth advised that he wanted the money, $100000, to be
given to his brother through Vannel who was to get the money from
Mady. The money would originate from Mady to Kevin to Sophat to
Vannel and finally to Reth's brother.

In the course of preparing Reth's defense, Reth
recalled someone mentioning a lawyer wanted to "intimidate
witnesses".

Money for Reth's attorney was eventually raised through
money which Reth used to purchase Fantasy Donuts, his personal
vehicles, a Lexus sedan and BMW, and money provided by Mady and
others.

97,673

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     7/23/99

On July 13, 1999, Chhayarith Reth, ███████████ was interviewed by Special Agent (SA) Stephen C. Laycock, Federal Bureau of Investigation (FBI) at the United States Marshal's (USM) Conference room, 450 Golden Gate Avenue, 20th floor, San Francisco, CA. Also present during the interview was Reth's attorney Dean Paik and Assistant United States Attorney (AUSA) Elizabeth Lee, Northern District of California. Reth was aware of the identity of the interviewing agent through previous interviews. Reth thereafter provided the following additional information regarding computer chip robberies he had knowledge of or participated in:

**Valtrix**

Reth advised that Valtrix was robbed twice. The first robbery consisted of Donovan (Donovan Wong), Mady (Mady Chan), Kevin (Kevin Liu), Benji, and himself. The crew first went to a Chinese supermarket and drove around in an old red Toyota truck prior to the robbery. Reth and Benji entered the business, while Mady and Donovan were lookouts. Reth advised that there were two Chinese males sitting at the front desk upon entry to the business. Benji pulled out his handgun and one of the males started "freaking out" and dropped to the floor. Benji took the employee to the back and ordered him to open the gate to the warehouse. Andy (Andy Chu) had previously told Reth that the company had a white caravan that had good product stored in it. Reth located the caravan and removed the product. They also took some VJ cards. Reth figured that the total value of the property taken was approximately $60,000. Reth advised that he was paid $10,000.

The second robbery consisted of Donovan, Mady, Thi, Mexican guy, Cartoon, Bologne, and Reth. Reth only recalled that a guy named Steve, who owns a store in Los Angeles, wanted some VJ cards, which is why they did the robbery for a second time. Reth recalled that they got approximately $100,000 worth of ████████████ product.

**PC Team**

101,304

Investigation on   7/13/99      at   San Francisco, CA

File # ████████████           Date dictated   7/23/99

by   SA Stephen C. Laycock

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Chhayarith Reth_____, On _7/13/99_, Page __2__

    Reth advised that this business is located near Bay 101 and Hokkins (computer business that Reth robbed). Mady and Donovan were the bosses of this robbery, but were lookouts for the robbery. Froggy, Thi (phonetic), Cartoon, and a Mexican guy from Stockton were the crew. Whole crew except for Donovan and Mady went inside business. Reth advised that prior to this robbery Reth was at Mady's fathers house in Stockton. Donovan gave Reth a diagram and gave out the orders for the robbery. Donovan gave instructions on how to get in the doors if they were locked. Froggy knocked on the front door. An employee came to the front door and opened it. The employee then tried to close the door on Froggy and not let the crew in. Froggy pushed his way through the front door. Once inside Froggy grabbed the employee and tied him up. Soon after, a white male came in and was apprehended and also tied up. Thi tried to get a ring of one of the female employees and hurt her finger attempting to do so. Reth advised that they did not get a lot of stuff, approximately $40,000, and recalled noticing a lot of empty Samsung boxes.

Lions

    Reth advised that this was Donovan's and Mady's job again. Reth and Kevin Liu were lookouts. Other crew members were Sang, PJ, Captain, and others that Reth did not recall at this time. Reth advised that the inside team was caught on the freeway after the robbery, except for PJ who was caught at Johnny Tram's house later after the robbery. Reth recalled that on this day Mady was supposed to travel to Canada. Reth advised that the information he received about the actions on the inside during the robbery were from PJ. Reth advised that PJ and Captain entered the business first and took control of the employees. Captain noticed that a female employee was pregnant and only tied up her hands, leaving her feet free. The female employee was able to escape. The crew then exited the business but could not get too far because there was heavy traffic. The police stopped the crew on the freeway and were arrested. Reth advised that he was told that the owner of Lions had an AK-47 inside the business.

CMC

    Reth advised that Mady and Kevin gave Reth a list of targets with CMC on the list. Reth was in charge of getting the

101,305

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Chhayarith Reth_____ , On 7/13/99 , Page 3

crew for the robbery which consisted of Ding Dong, Jha, Thi, and Bologna. Reth drove his BMW, Thi drove a Ford Blazer. Reth recalled that this was Ding Dong's first job. Reth advised that he decided to hit CMC after an earlier failed attempt from a company on the list provided by Mady and Kevin. Reth drove up to the front door of CMC, exited his car, and went to the front door of CMC. Reth asked and employee directions to the computer business that they had attempted to rob earlier. Reth recalled that he was buzzed in from an employee. Reth carried with him a .380 caliber handgun that did not have a magazine with bullets. Once inside, Reth tried to wave the rest of the crew to the front door but they did not respond. Reth then pulled out his handgun on the employees, then walked to the front door to tell the rest of the crew to enter. Once the employees were tied up and secured, Ding Dong went to the back of the business where he loaded two gym type bags full of product. Reth advised one of his crew members to unplug the telephones. Thi tried to get some jewelry off the employees. Reth recalled that he was angry because Thi always wanted to get jewelry from the employees. Reth and Thi had an argument and they split from each other after this robbery.

Reth drove from CMC to Bologne's house in Stockton near Leak's Park. Reth called Mady to tell him that they had done the robbery and they did not get much product. Mady thought Reth was holding back when he told him (Mady) they did not get a lot of product. Reth was paged later that evening, while at the Jackson Casino, by Mady and told to met Mady and Donovan at the Nut Pub restaurant. Reth met Mady and Donovan there and was again accused of holding back because of the small take from the robbery. Reth again advised Mady that they did not get a lot of product. At this time Reth believed that Donovan was having an affair with Reth's girlfriend Melissa.

AMT

Reth advised that this was one of his first robberies and was still in training. Reth recalled that this robbery occurred after the robbery at PC Ten at Westgate. Reth recalled that AMT was located off Montague Expressway in San Jose, CA, past CMC. Reth advised that this robbery was Mady's job and the crew consisted of Ducktail, Sophaet (Rainman), Wingman, Hang, Benji, and Reth. Reth advised that a window near the front door

101,306

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   Chhayarith Reth ▄▄▄▄▄▄▄▄         , On 7/13/99         , Page   4

of AMT was always open. Wingman and Rainman hopped through the
window and opened the front door for the rest of the crew. Reth
advised that one of the employees tried to run away but Rainman
rounded up all the employees at gunpoint and ordered them to the
ground. Reth advised that Rainman was blocking his face with a
handkerchief. Ducktail and Reth remained outside and upon
learning that the police were coming, Ducktail began crying. The
crew exited the area and although traffic was heavy, they were
able to get away. Reth was in contact with Mady and advised Mady
about the ▄▄▄ ▄ ▄ coming. Mady told Reth to get a motel of I-880
until the ▄▄▄▄ died down and it was clear to get on the
highway again. Reth advised that he was not paid much for this
robbery.

Teg Micro

Reth advised that this was Mady and Donovan's job and
also that this robbery had an insider that provided information.
The crew consisted of Reth, Ryan, Johnny Tram, and Mat (Mark).
Mady and Donovan told Reth everything that would happen during
the robbery which is why he (Reth) felt that it was an inside
job.     Reth and Ryan entered first with Reth asking an
employee for a job application. While Ryan was rounding up and
securing all the employees, Tram was let in by Reth. Tram saw a
female employee and took her to the back conference room. Ryan
then began loading the product. Reth noticed a safe and asked an
employee to open the safe, where Reth found an envelope
containing $20,000 in cash. The owner then showed up whereupon
Reth directed the owner to the conference room where the other
employees were being held by Tram. The owner advised Reth that
he had a key to the back door. Reth opened the back door and Ryan
and Mat loaded the product into the vehicles they had brought.

Golden West

Reth was unsure of the actual name, but he was sure
that the name began with "Golden". (Referencing police reports
indicate a robbery for a company titled Golden Micro.) Reth
advised that this was Mady's job. Mady and Donovan had a two
bedroom apartment located in Pleasonton, CA, off 580/680
highways. Donovan, Mady, and Kevin stayed at this apartment.
Mady showed Reth where the company was located. Reth recalled
that it was near where Teg Micro was located. While Mady was

101,307

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Chhayarith Reth_____, On _7/13/99_, Page ___5

showing Reth where the company was located, Mady entered the
company and inquired about a certain type of computer chip which
an employee advised him that they carried that type of chip.
Reth advised that Mady only noticed three or four employees at
that time. Mady and Reth returned to the apartment and decided
to do the robbery later that day.

Reth advised that the crew consisted of Reth, PJ,
Ducktail, Wingman, and Kevin. Ret? ised     ey crew had to
terminate the robbery quickly and police     sed       eaving Reth
behind. PJ, who was driving the v. traffic     parted. Reth asked
a female employee for her car keys. Reth went into the parking
lot and found the car, a Honda, and drove the car to a shopping
center parking lot next to Mady's and Donovan's apartment in
Pleasonton. Mady directed Ducktail and Wingman to move the car
to a different location. Reth recalled that they took
approximately $50,000 worth of product, whereupon Reth received
$5,000 for his part.

**Aristocrat**

Reth advised that Bora was at the robbery, but his role
was as a lookout. Bora did not have a gun and parked his
personal black Acura Integra at a Chevron gas station near
Aristocrat. Reth added that he and Sar (phonetic) were the first
to enter with Ho Sith entering third. Reth advised that they
were dressed in dress slacks, button-up shirt, with ties and
sunglasses. Once inside, Reth made a call to Sung (Kim Sung
You/phonetic) in the van and advised Sung to bring the van to the
rear of the business. Reth Srey was riding in the van with Sung.
Reth relayed that the van Sung was driving was the same van which
he was riding in when he was arrested in. Reth advised that
there was one male employee and three or four female employees.
The employees were tied up by Ho Sith with cable ties. Reth
advised that they did not get a lot of product in the robbery,
but what they got went to Mady. Reth added that the other
vehicles consisted of a police type car rented by Vannal Kim and
another car driven by Ton, whose brother is a Modesto police
officer. All crew members carried a gun except Bora. Nath Ny
(phonetic) acted as a lookout and was parked at a Chevron station
with Thong. Vuthy Hong (phonetic), from Boston, was in an
unknown car, and also acted as a lookout.

101,308

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of  **Chhayarith Reth** , On _7/13/99_ , Page ___6___

Piiceon

 Reth advised that this was John Luong's job and Luong
provided some people to do the robbery with Reth's group.  Reth
advised that his crew that participated consisted of Freeman,
Sung, Thong, Sar, and himself.  Reth relayed that Sung, Thong,
and Sar were the same that did the Aristocrat robbery.  Luong had
Freeman hang tight with Reth so Reth could train Freeman to do
robbery's.  Reth advised that he conducted video surveillance of
the location.  The crew stayed at a Super 8 motel in Pleasonton,
CA.  The robbery occurred in the morning time and the only
employee present was a white male who Reth described as 6'1" tall
and 250 pounds.  Reth advised that himself, Sar, Freeman, and an
unknown Chinese man rode in a Cadillac.  Once inside, Reth
noticed that a pair of bolt cutters which Reth ordered the owner
to use to open the gates.  While the robbery was taking place,
another employee entered carrying a cup of coffee, which was
thrown at Reth.  The employee was gathered and secured.  Reth
advised that he was paid $10,000 for his participation in the
robbery.

Zenon

 Reth advised that this was John Chu and Mady's job.
Reth was staying at the Sheraton Hotel and Mady was staying at
the Shilo Inn.  Chu came to the Shilo Inn and talked about Zenon.
Mady told Reth and Chu that he (Mady) knew the owner and that the
owner was related to someone that Mady knew from another company.
Mady drew a diagram of the location.

 Reth advised that at this time the robbery groups are
starting to split up.  Mady wanted to oversee everything, so John
and Jimmy Luong obtain their own groups so there could be more
crews.  Mady's new plan consisted of 10% off the profit from the
robberies would go to Jimmy Luong's group because Jimmy Luong's
groups were not yet producing any money but Mady's group, which
consisted of Reth, were making all the money.  Reth advised that
5% was also going to Kevin Liu.

 Reth advised that prior to the Zenon robbery, the crew
assembled at an Asian supermarket.  The crew consisted of Ding
Dong, Johnny Tram, Ryan, Mark, John Phay, and Ah Min (phonetic).

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of   Chhayarith Reth ███████████████ , On 7/13/99   , Page   7

Reth advised that he did not want a big group for the job.

Centon

       Reth advised that Ding Dong's group did this robbery
and Reth was not present.

       After the robbery of Centon had occurred, Reth and
Sophaet (Wingman) flew to Burbank, CA, and hooked up with Mady.
Mady advised Reth to return home and Mady would explain why
later.

       Reth advised that Ding Dong was paid one million
dollars for the Centon robbery which he used to purchase an auto
repair and a coffee shop in Santa Ana, CA.

       Reth advised that he was now being paid 5% of the
profits which consisted of $30,000 from the Centon robbery.  Reth
described this as a payback from Jimmy Luong' group for giving
Jimmy's group 10% of Mady's profits when Jimmy Luong was not
making any money.  Reth relayed that Ding Dong was working for
Jimmy Luong and Ding Dong's group did the Centon robbery and the
profits went to Jimmy Luong.

Alpha Systems

       Reth advised that Mady gave Reth Alpha System as a
target.

Smart

       Reth advised that Smart was a target given from Bob at
Excel Computers in Sacramento.

Maximus

       Reth advised that he did not participate in the robbery
of Maximus.  Van Di and his crew did the robbery.

Minnesota Robbery

       Reth heard that the crew was busted outside the
location of the robbery.  Reth heard that John Luong had raised

101,310

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Chhayarith Reth_____, On _7/13/99___, Page __8__

$20,000 for bail money for those arrested at the robbery.

**Date Pro**

Reth advised that the crew was similar to the crew in the Aristocrat robbery, which consisted of, Reth, Bora, Than, A Sung, Ho, Victor, and Sara. Mady and John Chu gave the target. Reth recalled getting $30,000 to $40,000 from Data Pro with Reth receiving $3,000 for his participation.

Reth advised that it was after the Data Pro robbery when he was arrested.

**Boston Trip**

Reth advised that he went on a trip to Boston with several others after the attempted robbery in Minnesota. Reth advised that he was asked by John Luong to go to Boston to check out a job, meaning a computer chip business. Reth advised that Luong gave him $3000 for expenses. Reth advised that he went to Boston with Freeman and Sam before Vannel's (Vannel Kim) group traveled to Boston. Vannel's group consisted of Vannel, Sar, and Bora. One he arrived in Boston, at Logan Airport from San Francisco, Reth was picked up by a Chinese guy, from the Boston area, that Reth described as Luong's contact in Worchester, MA. Reth advised that if he (Reth) needed more money while he was there, he was to meet with this same Chinese guy and he (Chinese guy) would help him (Reth) out.

Reth advised that Vannel's purpose traveling to Boston was to visit the area and to rent the vehicles needed to check out the computer chip businesses or do the robbery. Reth advised that they rented a room at the Holiday Inn in Worchester.

Reth advised that when he, Freeman, and Sam went to the airport to pick up Vannel and his group, they were walking toward the rental counter to rent a vehicle when they were stopped by the airport police and Id'd. Reth advised that everyone gave there real name and ID, except for Reth who gave the name Johnny Tram. Reth advised that the group was let go, but they had decided that they may be followed so they decided not to follow through with the robbery.

101,311

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Chhayarith Reth███████████████████ On 7/13/99___, Page ___9___

Reth advised that they were driven to New York to fly back to San Francisco because they felt they were being watched in Boston. Reth stated that the crew was driven to New York by a Boston Police Officer. Reth advised that the entire crew flew together from New York to San Francisco.

## Planning for robberies

Reth would typically meet with Mady prior to any robbery and discuss the robbery target and the expenses associated with putting the crews together for the robbery. Reth would advise Mady what he needed, expense wise, to proceed with the robberies. Reth advised that they would discuss the guns, phones, money for plane tickets and motels and vehicle rentals. Mady would give Reth money in advance to pay for all the expenses and when it came time to pay the crews for conducting the robberies, the expenses incurred were deducted prior to the crews being paid.

## Other criminal activity

Reth advised that Kevin Liu knew a man in either San Jose or Oakland who would produce fake Farmers Insurance checks for $2,500 which Reth would cash in his true name.

101,312

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription     9/1/99

On August 26, 1999, Chhayarith RETH (protect identity) was interviewed by Special Agent Nelson Low. Also present during the interview were AUSAs Richard Serafini and Elizabeth Lee. Additionally, RETH's attorney, Dean PAIK, was also present. RETH advised of the following information:

## Attempt robbery - Quantum Computers

RETH recalled a planned robbery of Quantum Computers during which RETH was driving with Benji in Mady's white Mitsubishi 4 door Gallante checking out the business. RETH noticed that a door to the business was "wide open" with only the owner present in the business. However, the planned robbery was abandoned/aborted when RETH noticed/believed that he was being followed by someone in another vehicle. Also present and prepared to assist with the robbery were Hang and Bun in a white car owned by Ducktail's brother; Kevin in a Datsun SX type vehicle; and, Mady and Don in a vehicle which RETH could not recall.

## Attempt robbery - unknown computer business behind Memory Source

RETH advised that a robbery was attempted of an unknown computer business owned by a Pakistani or Indian located behind Memory Source Computer Company off the Montague exit. RETH advised that Benji and Hang hid in the bushes for a period of time until they could approach and confront the victim. At the point the victim was approachable by Benji and Hang, they confronted the victim during which Benji pulled a gun on the victim. The victim resisted while being held at gunpoint during which a scuffle ensued. During the scuffle, Benji grabbed and choked the victim at one point. Because of the resistance and scuffle during the robbery attempt, Benji and Hang abandoned the robbery attempt and fled the scene without completing the robbery.

## Attempt burglary - Micro Distribution                    102,253

RETH advised that, at one time, Mady had an apartment on Brokaw Ave in the name of his wife or sister-in-law. During this time period, Mady discussed with RETH the possibility of

Investigation on   8/26/99        at  San Francisco, CA

File #  281E-SF-111963                          Date dictated   9/1/99

by   SA Nelson Low

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of ___Chhayarith RETH___ , On _8/26/99_ , Page ___2___

either robbing or burglarizing Micro Distribution. At some
point, Donovan told Mady that Micro Distribution had been
burglarized before. After having been told that Micro
Distribution had been burglarized, Mady decided to burglarized
Micro Distribution again.

Mady, Donovan, Kevin, and RETH subsequently went to
Micro Distribution and checked out the building and surrounding
area. Mady asked Donovan how to make entry into the business;
Donovan suggested a roof entry which required the use of a ladder
and U-Haul truck.

Preparations were then made to commit the burglary
during which RETH rented the U-Haul truck in Fremont, CA using
his own name and leaving a cash deposit of $80. The U-Haul truck
was driven and parked at or near Mady's apartment. RETH then
went to Mady's apartment and discussed the burglary plan with
Mady.

Subsequently, RETH and his associates, Sophat,
Ducktail, John (a Vietnamese male), and Peter (John's brother)
agreed to commit the burglary. On the day of the attempt
burglary, Sophat drove the U-Haul truck while RETH, John, and
Peter were in the back of the U-Haul truck. Once Sophat arrived
at Micro Distribution, Sophat opened the back of the truck and
RETH, Ducktail, John, and Peter exited the truck. They removed a
ladder which was brought with them and leaned it against the side
of the building. Sophat, RETH, Ducktail, John and Peter climbed
the ladder onto the roof of Micro Distribution. The fivesome
brought tools with them to pry the skylight(s) on the roof. In
the meantime, Mady and Donovan were in the area in Mady's white
Mazda Miata.

As the fivesome were on the roof, RETH spotted a
security guard driving around who appeared to have noticed the U-
Haul truck and/or the ladder against the building. RETH observed
the security guard park his vehicle in a manner to block the U-
Haul truck. As this was happening, RETH decided to flee the
scene. RETH jumped from the roof falling through branches of a
tree onto the ground. RETH's associates also jumped from the
roof and fled on foot from the scene. RETH noted that John
injured himself, possibly breaking his leg, when John jumped off
the roof. As such, they had to carry John as they fled the

102,254

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of __Chhayarith RETH__ _____ , On __8/26/99__ , Page __3__

scene.

RETH advised that they ran across a cotton/thorn field into a residential area and later hid in an animal barn while the police were searching the area. At some point, RETH learned that Mady was stopped by the police in the area of Micro Distribution while they searched for the suspects involved in the attempt burglary of Micro Distribution. Donovan was reportedly also in Mady's car at the time of the police stop.

Sophat later exited from the animal barn and walked to a Dennys where he paged and made contact with Mady. Mady arrived at a designated location and picked up the fivesome one at a time and drove them to the Brokaw Avenue apartment.

The police contacted RETH's ex-wife, Nay RETH, to question RETH concerning the U-Haul truck found at Micro Distribution. RETH did not respond to the request by the police to contact the investigating officer(s).

__Robbery - Micro Distribution__

RETH advised that he had given robbery targets, including Micro Distribution, to Hardhead. One day, RETH advised that he was shopping at Macy's with his ex-wife and children when he received a pager call to which he responded. During the contact, he spoke with Hardhead who told RETH that he (Hardhead) had robbed Micro Distribution. RETH then went to Peter's house where he called Mady and informed him (Mady) of this development. Mady told RETH not to worry and disclosed that he (Mady) and Kevin were at Micro Distribution during the robbery.

RETH proceeded to the Kentfield apartments where he met with Hardhead. RETH was told that Hardhead, Ding Dong, Iceman, and Little Joy had participated in the robbery. RETH also learned that Pentium chips were taken and had been dropped off at Little Joy's house. Kevin and Mady also went to the Kentfield apartments later to meet with RETH and Hardhead. Kevin subsequently took the van which was used during the robbery and drove it away.

The stolen chips which were stored at Little Joy's

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of  <u>Chhayarith RETH</u>                     , On <u>8/26/99</u>     , Page <u>4</u>

house were sold by Mady to unknown buyer(s). RETH advised that according to Bob at Excel Computers in Sacramento, the stolen Pentium chips were "recall" chips due to some defect. RETH described the chips as brown on top with gold on the bottom, possibly 90 MHZ.

After the sale of the chips, the money was split - RETH and Mady received approximately $80000 each while Hardhead received approximately $40000. A sum of money was also given to RETH in a black garbage bags for distribution - Peter received $10000, Little Joy received $8000, Ding Dong received $20000, and Peter received $10000.

RETH, Peter, and a Stockton car dealer went to a Long Beach car auction where RETH bought a Lexis for $40000. Because RETH did not have employment to support his ownership of a Lexis, the car was registered in his father's name to avoid possible suspicion or problems. RETH noted that though he received approximately $80000 for the robbery, he did not actually receive all the money. Mady kept RETH's money and gave it to RETH as RETH needed it. As an example, RETH advised that he went to Las Vegas to gamble and needed some additional money while he was there. He contacted Mady to ask for more money who would then arrange to wire money by Western Union to RETH in RETH's true name. RETH advised that when Mady wired the money, it was sent in the names of people such as Linda, Jillian, Jeanette, or Scott.

<u>Robbery - Unigen Computers</u>

RETH advised that Hardhead told RETH that he (Hardhead) had committed a robbery at Unigen. One of the participants known as Scooby Doo was involved in the robbery. During the robbery, the victims were lined up and weapons such as Uzis and Tec 9 were used. Hardhead reportedly sold the stolen property taken in the robbery to Donovan.

<u>Robbery - Hokkins Computers</u>

RETH advised that he, Ding Dong, and a group of Vietnamese from Oakland committed the robbery of Hokkins Computers. During this robbery, RETH met Nghia for first time and told Nghia what to do during the robbery.

102,256

FD-302a (Rev. 10-6-95)


281E-SF-111963


Continuation of FD-302 of    Chhayarith RETH                    , On 8/26/99  , Page    5

### Robbery - Maximus

RETH advised that John Chu identified Maximus Computers as a robbery target to Mady with a potential gain of approximately $500000 in computer product. Mady wanted RETH to do the robbery which RETH tried to do with John Phim Phay. RETH abandoned the effort with Phay when Phay "chickened out". Later, RETH told Hardhead about Maximus as a potential robbery target and gave Hardhead $3000 to help pay for expenses. Hardhead and Phay got together after which Phay showed Hardhead the Maximus location. Hardhead decided to proceed with a robbery of Maximus which he committed with others on a weekend. Hardhead subsequently called RETH and told RETH that "T-bone" had been caught committing the robbery.

Had the robbery been successful, Hardhead was to deliver the stolen property to RETH who would then deliver it to Mady to sell.

### Robbery - Zenon Computers

RETH advised that John Chu provided information to Mady and Kevin concerning Zenon Computers as a robbery target. On the day of and just prior to the robbery of Zenon Computers, Mady and RETH were together in the area of Zenon Computers when Mady placed a call to John Chu. During the call which was made in RETH's presence, Mady asked John Chu to call the owner of Zenon Computers to tell the owner that a "buyer" was on the way to Zenon Computers. Shortly after the call, RETH went to Zenon Computers posing as a "buyer". RETH was admitted into the business; RETH then opened the door for his back-up, Mark, to enter. The robbery operation proceeded shortly thereafter.

### Robbery - Piiceon Computers

As preparations were made to rob Piiceon Computers, the participants resided at a Super 8 Motel in either Pleasanton or Dublin. 3 or 4 individuals from Sacramento under John and other individuals were involved in the robbery.

Freeman had a video camera and videotaped the building and area surrounding Piiceon Computers. The robbery participants watched the videotape and made plans for the robbery which


102,257

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of ___Chhayarith RETH_____ , On _8/26/99_ , Page ___6__

reportedly would yield approximately $1 million in computer product.

On the day of the robbery, Sar (phonetic) drove a red Cadillac with RETH in the front seat and Freeman and an unknown Chinese male in the backseat. Soong (phonetic) and Ah Ruth (phonetic) were in a van. Sar was driving around Piiceon Computers when someone was seen opening a door to the business. Freeman and the unknown Chinese male, armed with guns, exited the vehicle and approached an unknown male. The unknown male was "stuck up" and forced to return into the business. RETH then exited the vehicle to assist Freeman and the unknown Chinese male with the robbery. After RETH exited the vehicle, Sar drove away and parked in the area.

RETH brought a wire cutter with him which was later given to the robbery victim to use to cut fencing in an area inside the business which secured computer merchandise. During the time, the victim was cutting the fencing, a second person associated with the business arrived. Freeman, armed with a gun, and RETH confronted the second person/victim who was holding a cup of coffee. The second person/victim was surprised by Freeman and RETH and threw coffee at them. The second person/victim was calmed and later escorted to a back area in the business where the second person/victim was told to lie on the floor and secured.

RETH then returned to the area which had the fenced/secured merchandise. RETH removed merchandise from inside the fenced area and passed merchandise to Freeman. Ah Soong was called and told to drive the van to the business to begin loading the stolen merchandise. Ah Soong drove the van to the business after which the stolen merchandise was loaded into the van.

The robbery participants then fled from the business in various vehicles; the van with the stolen merchandise was driven to the residence where the sister of Ah Soong resided. Ah Sing was called and subsequently went to the residence of Ah Soong's residence. RETH advised that Ah Sing then called Nam and arranged the sale of the stolen merchandise.

Following the robbery, RETH advised that Freeman and the unknown Chinese male went to a Stockton, CA motel near I-5,

**102,258**

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of ___Chhayarith RETH_____ , On _8/26/99_ , Page ___7___

March Lane exit, situated by a Denny's restaurant.

RETH advised that he later received approximately $15000 for the robbery.

## Robbery - Aristocrat Computers

RETH advised that Mady and Kevin provided RETH information concerning Aristocrat Computers and wanted RETH to commit the robbery of the business. Kevin and Mady had information that Aristocrat Computers was receiving a large shipment of merchandise. RETH was told to do the robbery at a certain time which RETH tried to do. However, when RETH and his associates went to do the robbery at around 5:00pm, the business was already closed.

Having missed the opportunity to rob the business the day earlier, RETH and his associates returned the following morning to rob the business. RETH drove from Stockton along with other robbery participants. They parked in the area of the business and waited for employees to arrive. Initially, there were two males waiting outside the business when a female arrived and opened the business. RETH quickly went to the business and entered behind the female who had opened the business. RETH, making up a name, asked the female for "Steven". The female told RETH that "Steven" had left the company and did not work at the company any longer. RETH then went to the door and opened to allow Sar (phonetic) entry. RETH and Sar then told the female that she was being robbed. The female and two male employees were secured by the robbery participants including a lady in her 50's who entered the business as the robbery was in progress. RETH recalled that she was tied by "Ho" who had entered the business during the robbery through the front door.

RETH advised that he did not take much merchandise because not much was available. The merchandise which was taken was estimated to be worth approximately $15000 by Reth; the merchandise was given to Kevin. Kevin was angry at RETH because Kevin believed that RETH had actually gotten more merchandise and was hiding the bulk of the robbery merchandise. RETH advised that because of Mady and Kevin's "inside" information (large shipment of merchandise to Aristocrat Computers a day earlier), they expected a substantial amount of merchandise from the

102,259

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of ___Chhayarith RETH_____, On 8/26/99 ___, Page ___8___

robbery.  RETH became angry with Kevin for being upset and accusing him of stealing.  RETH called Mady who later calmed Kevin and RETH.

Robbery - Data Pro Computers

     While preparations were underway to rob Data Pro Computers, Industry, CA, RETH advised that he stayed in a house with a Cambodian in the area.  When the robbery of Data Pro was about to be committed, RETH met with the robbery participants at the Best Western Motel where final discussions and preparations were made before going to the business.  John Chu had passed word to commit the robbery between 4:00 to 5:00 pm.  As the robbery participants, consisting of 6 people, proceeded to the business, Mady and Kevin were somewhere in the area.

     Upon arrival at Data Pro Computers, RETH and Sar (phonetic) walked into the business posing as customers.  RETH asked for someone whose name he made up and indicated that he wanted to purchase some computer parts.  Sar was carrying a briefcase and at some point opened it.  RETH removed a gun from the briefcase and announced the robbery.  A female employee was on the telephone and RETH told her to terminate the call.  Other robbery participants then entered the business and proceeded to go through the business looking for merchandise to take.  During the robbery, one of the participants, Tanh (phonetic), struck a victim on the head with a gun.  RETH also recalled that a Rolex watch was taken from a victim during the robbery.

     RETH advised that nothing of value was taken in the robbery.  RETH was yelled at by Kevin who thought the business had a lot of merchandise to be taken by the robbery group.  This belief was based upon information given by John Chu who assumed that there would be a large amount of merchandise in the business at the time of the robbery.  RETH advised that Kevin thought that RETH had stashed or stole the proceeds of the robbery from Kevin and Mady.

Robbery - Cal Info, Los Angeles, CA

     RETH advised that he participated in a robbery believed to be Cal Info which he committed for Donovan and Mady.  RETH recalled that Amnath and Dung/Ding Dong also participated in the

102,260

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of ___Chhayarith RETH_____ , On _8/26/99_ , Page ___9___

robbery.  During the robbery, RETH advised that he was dealing
with a female victim who was resisting RETH who was trying to
secure her.  She kicked and scratch RETH which angered RETH.  In
retaliation, RETH fondled her breasts.  While RETH fondled the
female victim's breasts, Dung told RETH words in effect, "let's
go".  The female victim was secured by RETH after which he
departed as directed by Dung.

        RETH advised that Donovan told RETH that the robbery
was not reported to the police.  Additionally, Donovan told RETH
that he (Donovan) knew the owner to the business.

Information concerning Freeman

        RETH advised that he was told by Ah Sing to train an Ah
Sing associate who was inexperienced in the robbery of computer
businesses.  Ah Sing introduced the newcomer, Freeman, to RETH at
the ABC Bakery on Webster Street in Oakland, CA.  Sing provided
robbery target locations to RETH who in turn gave them to Freeman
to check.  Freeman conducted pre-robbery surveys and provided the
results of his findings to RETH for consideration.  RETH advised
that Freeman's first robbery was Piiceon Computers.  RETH felt
that Freeman seemed "scared" during the robbery but continued to
work with him because Ah Sing wanted Freeman to be with Charlie
to gain experience.  RETH believed that Ah Sing kept Freeman with
Charlie as a way to monitor the activity(ies) of RETH and
minimize skimming of stolen merchandise after a robbery.

Travel to Boston, MA

        RETH advised that he traveled to Boston, MA at the
request of Ah Sing at one time to conduct a preliminary check for
committing robberies in the Boston area.  When RETH arrived in
Boston, he was picked up at the airport by someone whose name
RETH could not recall.  He was taken to the Holiday Inn in
Worcester, MA where RETH stayed during his visit.  Sam and
Freeman were also in Boston and had gone to look at potential
robbery targets.  Freeman told RETH that it seemed possible to do
robberies in Boston; RETH called back to Stockton, CA and
summoned his associates to travel to Boston for a possible
robbery operation.

        Vannel, Paul, Bora, and Sar flew to Boston as directed

Case3:96-cr-00094-JSW   Document2126-6   Filed11/27/13   Page19 of 21

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of   Chhayarith RETH _____ , On 8/26/99 , Page   10

by RETH.  Shortly after their arrival at the airport, the,
foursome was stopped by the police and detained for reason(s) not
known to RETH.  During the stop and detention, RETH went to the
bathroom hoping he would not be stopped like the foursome.  When
RETH exited from the bathroom, he was also detained by the
police.. He identified himself to the police as Johnny Gia Tram
and told them that he worked at the Cameo Card Club in CA.  The
group was released after they were identified; RETH believed that
the police continued to follow the group at least from the
airport to Worcester, MA.  RETH decided to abort any robbery
operation in the Boston area because of the police contact.

     After RETH returned from Boston, Ah Sing wanted RETH
and his associates to rob Future Computers in the South bay area.
RETH told Ah Sing that Future Computers had been robbed before
and did not want to do it.  Ah Sing then told RETH to go to Los
Angeles to commit robberies there with Freeman.  RETH agreed to
do robberies in Los Angeles but later made up a story and told Ah
Sing that he could not proceed immediately to Los Angeles because
of an automobile mishap.  RETH assured Ah Sing that after the
automobile mishap, though guns were in the car, he was able to
take care of the guns and not lose them.  In reality, RETH did
not want to go to Los Angeles at the time because of his romantic
interest in a Cambodian singer.

Information concerning John Chu

     RETH advised that he met John Chu sometime after the
Alpha Systems robbery.  John Chu had flown to Sacramento and
rented a Corsica vehicle to pick up some computer product stolen
in a robbery.  John Chu, his girlfriend, and Bill went to Mady's
house where RETH was present during a meeting.  RETH was
introduced to John Chu and Bill by Mady; John Chu and Bill
subsequently gave their pager numbers to RETH for contact with
them as necessary.  At some point, Mady told RETH to contact John
Chu directly to obtain robbery targets as needed.

     RETH advised that when Mady got robbery target
information from John Chu, they tended to be more reliable and
profitable than robbery targets given by Jimmy and Ah Sing.  RETH
advised that since John Chu was in the business, he could get
better information, without suspicion, through his daily contacts
with various companies in the computer business.

102,262

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of    Chhayarith RETH _____ , On 8/26/99 ____ , Page ___11___

    Jimmy and Ah Sing got robbery target information from a "big book". Their information tended to be less reliable and at times inaccurate. Some of the robbery targets given by Jimmy and Ah Sing turned out to be businesses which had little or no possibility of obtaining the type of product, i.e. computer chips, the group wanted.

## Information concerning Andy Chu

    RETH advised that Andy Chu identified the following companies as potential robbery targets:

    Valtrix, Teg Micro, Micro Distribution, AMD, and PC Team.

    RETH also noted that Andy's information tended to be detailed and reliable which resulted in more profitable robberies.

## Information concerning Mady Chan

    RETH recalled a discussion with Mady during which Mady wanted RETH to be less involved with robberies and take "commission only". By taking "commission only", RETH advised that Mady proposed that RETH receive a percentage of the profits from the sale of the stolen merchandise taken in computer businesses. The robberies would continue to be committed by RETH's associates but RETH would be less involved. Mady wanted to reduce RETH's exposure which meant a reduced likelihood of RETH being arrested by the police.

    RETH did not agree to Mady's proposal believing that Mady was not always forthcoming in their transactions. Additionally, RETH was able to establish some buyers of stolen merchandise himself and did not necessarily need Mady to sell stolen merchandise taken in the robberies.

    RETH also noted that Mady had a rivalry with Om Soon at one time because of incidents between followers of Mady and Om Soon. Shootings between associates of Mady and Om Soon including a shooting in which Sophat, an associate of Mady, was shot on July 4 and a shooting of one of Catfish's people, followers of Om Soon, caused high tension between Mady and Om Soon. So serious

102,263

FD-302a (Rev. 10-6-95)

281E-SF-111963

Continuation of FD-302 of   Chhayarith RETH                              , On 8/26/99      , Page    12

the situation, Mady, frightened by the shootings, bought a
bulletproof vest to protect himself.

However, Mady's brother-in-law, Jimmy intervened on
Mady's behalf and calmed the rivalry.  Associated with Om Soon
from the past, Jimmy worked out the problem(s) between Mady and
Om Soon resulting in a settlement of differences.

RETH noted that Om Soon was an extortionist in the
past.

102,264

JOHN THAT LUONG
Reg. # 08838-097
U.S.P. - Canaan
P.O. Box 300
Waymart, PA 18472

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. CR96-00094-1 JSW |
| Respondent, | ) | |
| v. | ) | THE HONORABLE JUDGE |
| | ) | JEFFREY S. WHITE |
| JOHN THAT LUONG | ) | |
| Petitioner. | ) | |

### ORDER

AND NOW, TO WIT, this _____ day of _____, 2015, after due consideration of the within Supplemental Application For Certificate Of Appealability With Suggestions In Support, it is hereby ordered and decreed that the within Supplemental Application For Certificate Of Appealability With Suggestions In Support is GRANTED.

By the Court:

_____
Judge

JOHN THAT LUONG
Reg. # 08838-097
U.S.P. - Canaan
P.O. Box 300
Waymart, PA 18472

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA    )    Case No. CR96-00094- 1 JSW
                            )
          Respondent,       )
                            )
          v.                )
                            )    THE HONORABLE JUDGE
                            )    JEFFREY S. WHITE
JOHN THAT LUONG             )
                            )
          Petitioner.       )
                            )
_____    )

SUPPLEMENTAL APPLICATION FOR
CERTIFICATE OF APPEALABILITY
WITH SUGGESTIONS IN SUPPORT

To the Honorable, the Judges of the Said Court:

COMES NOW Petitioner, JOHN THAT LUONG, and pray's this Court
issue a Certificate of Appealability In Support of Application.
Petitioner Luong states as follows:

(1) Petitioner Luong hereby incorporates by reference and asks this
Court to consider this Supplemental Application and the Application
filed by Petitioner Luong, in conjunction with each other, and for
his suggestions in support of, Petitioner Luong states as follows:

SCOPE OF REVIEW FOR C.O.A.

Congress mandates that a prisoner seeking post-conviction relief
under 28 U.S.C. §2255 has no automatic right to appeal a district
court's denial or dismissal of the Petition. Instead, petitioner
must first seek and obtain a C.O.A.. Slack v. McDaniel, 529 U.S.
473, 481 (2000). A prisoner seeking a C.O.A. need only demonstrate

"a substantial showing of the denial of a constitutional right."
28 U.S.C. §2253(c)(2). A petitioner satisfies this standard by de-
monstrating that jurists of reason could disagree with the district
court's resolution of his constitutional claims or that jurists
could conclude the issues presented are adequate to deserve encou-
ragement to proceed further. Slack, supra., at 484.

Applying these principles to Petitioner Luong's Application, a
C.O.A. should be issued for the following grounds:

(A) INEFFECTIVE ASSISTANCE OF COUNSEL

(1) Failing To Interview And Call Chhayarith Reth As A Witness

Jurist of reason could disagree with this Court's decision that
the district court factual findings pursuant to the Aristocrat rob-
bery, and jurist of reason's decision would be different if they
could of heard the testimony of Chhayarith Reth stating the facts
of the FBI-302 Reports, where he told the FBI that Petitioner Luong
had nothing to do with the Aristocrat robbery. The jurist of reason
could also disagree with the district court's decision, finding that
the failure to present the testimony of Chhayarith Reth was not
prejudicial because of the other overwhelming evidence of Petitioner's
guilt and that there is no reasonable probability that Chhayarith
Reth's testimony would have changed the outcome of the proceedings.
It is debatable among jurists as to whether the Government presented
overwhelming evidence of Petitioner Luong's guilt for the robbery
of the Aristocrat company. In Stanley v. Bartley, 465 F.3d 810 (7th
Cir.2006), the issue is not whether Petitioner Luong is innocent,
but is whether if he had a competent lawyer, he would have had a
reasonable chance. It need not be a 50 percent or greater chance,
Miller v. Anderson, 255 F.3d 455, 459 (7th Cir.2001), of being ac-

quitted, given that guilt must be proved beyond a reasonable doubt. Guilty people are often acquitted.

in the Chhayarith Reth's statements in the FBI-302 Reports, it is un-refutable that Petitioner JOHN THAT LUONG is truly innocent of that crime - the Aristocrat robbery. Based on this fact Petitioner Luong's trial counsel performance clearly fell below an objective standard of reasonableness, and Petitioner Luong trial counsel's deficient performance prejudiced Petitioner Luong, resulting in an unreliable or fundamentally infair outcome in the proceeding. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Base on this fact Petitioner Luong is entitled to a C.O.A. on this ground, because he has made a substantial showing of a denial of his constitutional right to effective assistance of counsel, or that this ground is adequate to deserve encouragement to proceed further. Therefore, this Court should grant Petitioner Luong a C.O.A..

CONCLUSION

Wherefore the following reasons stated above, Petitioner Luong prays this Court to issue a C.O.A. on the grounds set forth in Petitioner Luong's Application, as well as this Supplemental Application. He further prays for any other and further relief which this Honorable Court may deem just and proper under the circumstances. He forever prays.

Date: 5/19/2015                    Respectfully submitted,

By: _____
    JOHN THAT LUONG
    Reg. # 08838-097
    U.S.P. Canaan
    P.O. Box 300
    Waymart, PA 18472

## CERTIFICATE OF SERVICE

I, JOHN THAT LUONG, hereby the undersigned, certifies that on the date below a true and correct copy of the foregoing was conveyed to prison authorities for mailing in accordance with Prison Legal Mail Policy with First Class U.S. postage prepaid and properly addressed to the following party:

W.S. Wilson Leung
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102-3495

Date: 5/19/2015

Submitted by,

JOHN THAT LUONG
Reg. # 08838-097
U.S.P. Canaan
P.O. Box 300
Waymart, PA 18472

5 of 5